1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

9
10

LESLIE GRAHAM,

Petitioner,

11
12

v.

ATTORNEY GENERAL OF THE STATE
OF NEVADA,

13

Respondents.

Case No. 2:09-cv-01069-MMD-VCF

ORDER

14

15       This habeas matter comes before the Court for a final decision on the merits.

16   **I.     BACKGROUND**

17       Petitioner Leslie Graham challenges his 1997 Nevada state conviction, pursuant

18   to a jury verdict, of first-degree murder, in connection with the death of eight-month-old

19   Chelsey Hachez from three skull fractures.  He is serving a sentence of life without the

20   possibility of parole.  He challenged the conviction on direct appeal and state post-

21   conviction review.

22       **A.     The Principal Factual Issue Presented**

23       In the federal petition, petitioner presents three grounds alleging principally

24   claims of ineffective assistance of trial counsel, which are described in greater detail

25   *infra*. Petitioner alleges in principal part in the three grounds that he was denied

26   effective assistance because counsel failed to present expert medical testimony in

27   support of a defense theory of second-degree murder by child neglect.  Such a defense

28   theory would posit that the State had proved no more than that Graham failed to

1   properly respond to the infant's condition rather than that he committed child abuse by

2   himself causing her three skull fractures.

3          **B.      Relevant Trial Evidence and Proceedings**

4          On federal habeas review, the Court considers whether the state supreme court's

5   rejection of petitioner's claims on the merits was either contrary to or an unreasonable

6   application of clearly established federal law as determined by the United States

7   Supreme Court, under standards outlined further *infra*. The trial evidence served as

8   backdrop to the state supreme court's rejection of petitioner's ineffective-assistance

9   claims. The Court accordingly first summarizes the trial evidence that relates to

10  petitioner's claims.

11         The evidence at trial tended to establish, *inter alia*, the following.[1]

12         As of April 6, 1996, 21 year-old Kimberly Hachez and her eight-month-old

13  daughter Chelsey had been living with 32 year-old Leslie Graham in a Las Vegas

14  apartment for a little over two months. Chelsey was Hachez' daughter with her husband,

15  Eric Hachez, from whom she was separated and seeking a divorce. The Hachez couple

16  had been married for only about a year prior to the separation. Kimberly and Eric

17  Hachez had joint custody of the baby.[2]

18         Kimberly Hachez met Leslie Graham in September 1995 at their workplace, a

19  home products store.  When she left her husband on January 26, 1996, she moved in

20

21              [1]The Court makes no credibility findings or other factual findings regarding the
22  truth or falsity of evidence or statements of fact in the state court. The Court
    summarizes same solely as background to the issues presented in this case, and it
23  does not summarize all such material. No statement of fact made in describing
    statements, testimony or other evidence in the state court constitutes a finding by this
24  Court. The significance of other evidence or categories of evidence referred to by
    petitioner in support of his claims is addressed in the discussion of the particular claims.
25  The present recital of the evidence constitutes only an overview for context.   Any
    absence of mention of a specific piece of evidence or category of evidence in this
26  overview does not signify that the Court has overlooked the evidence in considering
    petitioner's claims.

27              [2]Dkt. no. 37-1, Ex. 18, at 42-43, 45-46, 49-50 & 66-67; see also dkt. no. 37-5, Ex.
28  18d, at 13 & 31 (background factual material for extrapolating petitioner's age); dkt. no.
    37-3, at 24-27 (further testimony regarding custody).  Kimberly Hachez was 22 at trial.

with Graham.  The relationship was one of "boyfriend-girlfriend," and Hachez intended to marry Graham.[3]

Hachez testified that in her experience Graham was "very good" with his two daughters, and she considered him a "good father."  She testified that "[w]hen he first started coming over, he was very good with Chelsey."  She told others that Graham treated Chelsey like she was one of his own daughters and that he was "very good" with her.  She never saw Graham hit Chelsey, and she had no concerns leaving her with him.  Hachez also testified, however, that "[t]here was [sic] times that he would just not really want to deal with her, but usually when he was drinking, that's when that would happen."[4]

As of April 6, 1996, the couple was in the process of moving from Las Vegas to Pahrump, Nevada.  They had stayed the prior night at the former Days Inn in Pahrump. The plan for the day was that Graham would take Chelsey with him to Las Vegas and pick up some items from their old apartment while Hachez was at work in her new job. Hachez testified that, for her at least, the drive to the outskirts of Las Vegas took approximately "about an hour, hour and a half," although Graham possibly could have made it in less time.[5]

Graham left at approximately 8:50 a.m. with Chelsey in a car seat and a cooler full of beer.  Hachez testified that she did not recall seeing Graham drink any beer that morning, but she was not paying attention and was "not really sure."  It would not have been common for him to drink beer in the morning in their prior two months together.[6]

---

[3]Dkt. no. 37-1, Ex. 18, at 43-46, 63-65 & 66-67.

[4]Dkt. no. 37-1, Ex. 18, at 64-66.

[5]*Id.*, at 46-49, 56, 58-60 & 69. The Court notes, strictly in passing as backdrop, that the Google Maps directions feature reflects that the drive from the 1101 South Highway 160 address of the former Days Inn in Pahrump to the 6500 West Charleston address of the couple's apartment, via South Durango Drive from Highway 160 in town, would cover 58.1 miles and take one hour and twelve minutes.  Alternate routes instead using more expressway in lieu of surface streets would add up to two minutes to the drive.

[6]Dkt. no. 37-1, Ex. 18, at 56-57.

3

Kimberly Hachez strapped her daughter Chelsey into the car seat before they left.  She testified that the baby was alert, happy, and in good general health at that time.  (Dkt. no. 37-1, Ex. 18, at 70-71 & 73; *see also id.*, at 50-55 (overall health).)

At 10:25 a.m. on April 6, 1996, the 911 dispatcher for the Las Vegas Metropolitan Police Department ("Metro") received an emergency call from Leslie Graham, which was routed to a medical dispatcher.  Graham stated that he hit or pushed his eight-month old infant in the stomach and that she could not breathe.  He said that the baby had something coming from its nose but was not breathing and was just lying there without moving.[7]

Las Vegas Fire Department Paramedic Eric Cheese was the first responder to arrive at the scene.  He found the baby on the floor with Graham also present.  Graham told Cheese that the baby had been crying, that he gave her a bottle with milk, that the bottle fell off the bed, and that the baby reached for the bottle and fell off the bed.[8]

Mercy Medical Services Paramedic Paul Maiocco arrived only two to three minutes after the fire department.  Graham told Maiocco initially that the baby fell off the bed and began having some kind of choking reaction, that he went to the baby and gave a chest thrust, and that the baby then became unresponsive with no heartbeat.[9]

The infant exhibited no vital signs, with no heartbeat, pulse, systolic blood pressure, electrocardiogram signal, unassisted respiration, or capillary refill.  Her pupils were fixed and unreactive to light.[10]

The paramedics sought to intubate the infant so that they could provide assisted respiration.  While doing so, they found substantial trauma to the back of her skull.[11]

---

[7]Dkt. no. 37-1, Ex. 18, at 19-25 (911 audio custodian testimony); *see also id.*, at 7-8 (unchallenged recital during the State's opening of the content of the 911 audio played for the jury); *id.*, at 37-39 (discussion by counsel); dkt. no. 37-4, Ex. 18c, at 9-10 (closing).

[8]Dkt. no. 37-3, Ex. 18b, at 32-33 & 36.

[9]*Id.*, at 51 & 53-54.

[10]*Id.*, at 44-50 (Maiocco).

[11]*Id.*, at 33-35 (Cheese); *id.*, at 52-53 (Maiocco).

4

Cheese testified that he could actually feel the depression on the back of the infant's skull. He testified that "[i]t was like part of her skull was detached from – it wasn't – it wasn't a solid mass." To Cheese, a paramedic with over six years of experience, this reflected that the infant had a fractured skull. He testified that it was a "very bad" injury that he "would say . . . was inconsistent from just falling forward to reach for a baby bottle."[12]

Maiocco testified that his Mercy paramedic coworker similarly noticed a large hematoma, or pooling of blood under skin, at the back of the infant's skull. Maiocco testified that when he then palpated the area, it felt, in lay terms, "very mushy" or "very soft." As he related at trial, "[t]here was no sense of having [the back of the head] intact with the skull and [the hematoma] covered most of the back of the head." He related that the area was three inches in diameter, which covered most of the back of the head for an eight-month old infant.[13]

Maiocco thereupon confronted Graham about his account as to what had happened to the infant:

> As we were – as I was examining the head realizing that the story didn't fit quite into what he was telling us, I asked him or questioned him about any kind of trauma to the patient's head. At that point he changed his story and said, yeah, the patient fell and hit his head or hit her head – excuse me – hit her head first and then went unconscious.

Dkt. no. 37-3, Ex. 18b, at 54.

Metro Officer Redell Moore was the first police officer to arrive at the scene. When he arrived, the paramedics were working trying to revive the baby. When the officer questioned Graham, Moore smelled the odor of alcohol coming from Graham, and Graham's eyes "were also kind of sleepy and blood shot looking, a little bit like he had been drinking." Moore also saw the cooler with the beer inside the apartment. ///

---

[12]Dkt. no. 37-3, Ex. 18b, at 29 & 34-35.

[13]*Id.*, at 52-53.

1   Moore testified that he would have performed a field sobriety test on Graham if it had

2   been a traffic stop.[14]

3           Officer Moore testified that Graham was "extremely distant from me," that "[h]e

4   tried to stay away from me," and that "[h]e tried to avoid speaking to me."  He testified

5   that Graham "kept walking away" and that he "never wanted to stay and face me and

6   talk to me," such that Moore had to "keep asking him to stop and following him

7   throughout the apartment."  Moore described Graham as being "extremely nervous,

8   [and] his demeanor was wherever I was, he was in the other room."[15]

9           Officer Moore testified as follows regarding what Graham told him about what

10  happened to the baby:

11              A:     He told me that he was moving boxes from the patio
                      inside the house and inside the house out to the patio.
12                    The baby was on the side of the bed and the baby
                      dropped the bottle over the side of the bed. The baby
13                    went to get the bottle and fell down and hit her head
                      and become unconscious.
14
15              Q:     Okay.  Did he tell you where he was when he saw the
                      baby do this?
16              A:     Yes, he stated he was on the patio placing the box on
                      the ledge.
17
                Q:     Did you go on the patio and stand where he said he
18                    had been standing?

19              A:     Yes, I did.

20              Q:     From that location, could you see this bed?

21              A:     You couldn't see the bed from the location
                      where the ledge was, no.
22

23  Dkt. no. 37-1, Ex. 18, at 29.

24          Metro Detective Allen Garris arrived several minutes after the patrol officers.

25  Graham then told another different version of what had happened to the baby.  Graham

26

27          [14]Dkt. no. 37-1, Ex. B, at 29-34.

28          [15]Dkt. no. 37-1, Ex. B, at 32-33.

6

gave a recorded statement and also reenacted for Garris what allegedly had happened.[16]

According to this account, the baby, who had been awake and alert up to this point, was lying on the bed with her bottle but she then rolled off the bed onto the floor and started crying.  Graham picked her up, lay her back on the bed, and placed the bottle in her mouth.  However, after the baby continued crying, he picked her up and lifted her up to his face holding her by her torso and blew on her face in an effort "to stop her hyperventilating."  Thereafter, as the baby continued crying, he turned her around and held the eight-month-old infant in a "bear hug" facing away from him. Graham expressed to Garris "the emotion of being somewhat angered with the child at that point," and he stated to Garris that "he figured squeezing the child would, perhaps, make it quit crying."  It then became necessary for him to administer CPR to the infant, which he did after laying the baby on the floor.[17]

In contrast to Officer's Moore's observations, Detective Garris did not recall smelling the odor of alcohol coming from Graham.  However, Graham was smoking cigarettes during the time that he spoke with Garris; and the detective observed the cooler with beer in the apartment.  The detective testified that Graham did not appear to be intoxicated to him and did not slur his speech.  Graham appeared to the detective to be "quite upset" and "distraught" as to the infant's condition.[18]

Forensic examination of the apartment reflected that the top of the mattress in question was nineteen inches from the floor, which was covered by carpeting with padding.  A section of the carpet and padding was secured as evidence.[19]

///

---

[16]Dkt. no. 37-2, Ex. 18a, at 54-56, 65-74 & 98-108.

[17]Dkt. no. 37-2, Ex. 18, at 65-73; dkt. no. 37-4, Ex. 18c, at 7-8 & 45-46 & 48 (recital in closing).

[18]Dkt. no. 37-2, Ex. 18, at 57-58, 63, 99, 104 & 106-07.

[19]*Id.*, at 111-16.

1    Dr. Richard Sterett, M.D., was the pediatric critical care specialist who ultimately

2    served as the lead physician during attempts to revive the baby at University Medical

3    Center in Las Vegas.  He was qualified as an expert witness in pediatric care at trial

4    without objection.  (Dkt. no. 37-2, Ex. 18a, at 81-86.)

5    When Chelsey Hachez arrived at the emergency room, she had no palpable

6    pulse, her heart was not contracting in a manner that would provide sufficient blood flow

7    to support life, and she was not breathing on her own.  Based on these findings and the

8    acid level measured in her blood initially, Dr. Sterett testified that "it's my best opinion

9    that she was essentially dead on arrival and they [the initial trauma response team]

10   were able to resuscitate her."[20]

11   When Dr. Sterett examined the baby, she had a steady pulse with a regular

12   heartbeat, following administration of several doses of adrenaline.  However, she had

13   no spontaneous respiratory effort such that she was not breathing on her own.  There

14   was swelling of her scalp, primarily at the back of her head.  Her pupils were fixed,

15   dilated and nonreactive.  Dr. Sterett further observed bleeding, or hemorrhaging, at the

16   back of the eyes along the retinae.  He testified that this retinal hemorrhaging was a

17   sign of severe head injury.  She was not responsive to painful stimulus and otherwise

18   exhibited no neurological activity.[21]

19   At that point, dopamine was being used to help drive her heart and keep her

20   blood pressure up, although her blood pressure nonetheless "was marginal at best."  It

21   was taking continuous administration also of adrenaline to keep her blood pressure up.

22   Dr. Sterett called in a neurosurgeon and child neurologist to assist in the evaluation.[22]

23

24   ───────────────

[20]Dkt. no. 37-2, Ex. 18a, at 86 & 89-90.  Paramedic Maiocco also testified that
25   they were able to get a heart rate back on the infant through several rounds of drugs.
     Dkt. no. 37-3, Ex. 18b, at 45-46. Maiocco further testified that, looking back at the
26   totality of the circumstances presented during her care by the paramedics, "we probably
     could have, if we so chose, to call the patient dead at the scene."  *Id.*, at 51-52.

27   [21]Dkt. no. 37-2, Ex. 18a, at 86-89.

28   [22]*Id.*, at 89-90.

1       A CAT scan showed multiple skull fractures or, as Dr. Sterett characterized the

2   baby's injuries, "basically her skull was fairly shattered."  Her brain was starting to swell,

3   after essentially having been in cardiac arrest when she arrived and not having enough

4   blood flow to her brain.  Dr. Sterett explained that, as with any body part, the brain

5   swells when it is injured.  However, the skull tends to inhibit the expansion, such that the

6   brain eventually can expand to the point that it compresses its own blood supply and

7   starves itself.  He testified that "that's exactly what was happening" over the course of

8   the time that the trauma team was trying to revive the baby.[23]

9       The brain was swollen to the point that the blood pressure within the brain was

10   equivalent to the blood pressure outside the brain. Dr. Sterett testified that this was

11   occurring in an overall situation "where we were just basically having a lot of problems

12   just keeping her blood pressure up."  Such a circumstance of equivalent blood pressure

13   does not permit blood to enter the brain and leads to brain death.   After further

14   radiologic marker testing confirmed that there was no blood flow entering the brain, Dr.

15   Sterett officially pronounced Chelsey dead at 5:34 p.m.[24]

16       Dr. Sterett testified that the type of severe injuries that he observed in Chelsey

17   could result in an infant by accident only from a high speed motor vehicle accident or a

18   fall from a height of greater than ten to fifteen feet.  Even with an infant's fall from such a

19   height, the fractures would be centered in one area.  Chelsey instead had sustained

20   "fractures on one side of the skull and then fractures on the other side of the skull."

21   Such fractures would not be sustained in a fall from a height.[25]

22       Dr. Sterett elaborated that trauma affected the brain of an infant differently than it

23   did with an adult, because the heads of infants were larger and their neck muscles were

24   not as strong.  Accordingly, a blow to the head of an infant will cause the neck to move

25   more violently and the brain tissue to move with greater force.  The blow thus would

---

[23]Dkt. no. 37-2, Ex. 18a, at 90-92.

[24]*Id.*, at 92-94.

[25]*Id.*, at 94-95.

result in injury not only at the site of the initial blow but also on the opposite side of the skull.  The retinal hemorrhaging that Dr. Sterett observed in his examination was consistent with this violent movement of the brain tissue, with resultant tearing of the associated blood vessels.  He testified that "that's why retinal hemorrhage is evidence of not always, but most of the time, evidence of some type of significant brain injury."[26]

Dr. Sterett testified that in a severe injury of this type "you may have immediate loss of consciousness and you may even have immediate cardiac arrest."  However, "you may also have a period of time where the child will, before the swelling starts, you may have a period where the child is very fussy or very sleepy, but with the severity of this injury, one wouldn't expect that to last very long."  He testified that "[i]n an injury that's severe enough to give an arrest, [such a period could last] no more than an hour at the maximum; most likely much shorter."[27]

Dr. Sterett concluded his testimony with the following opinion based upon his evaluation of the baby in attempting to revive her and his expertise as a pediatric critical care specialist:

> Q:    So, in your opinion, this was not a fall from a bed?
>
> A:    No, this is not a fall from a bed.  This was a traumatic injury.

Dkt. no. 37-2, Ex. 18a, at 97.

After speaking with the police at the apartment, Leslie Graham went to the hospital, during the time that the trauma team was trying to revive the baby.  At the hospital, Graham stated to Kimberly Hachez, variously, that Chelsey had fallen off the bed and he had tried to give her CPR and that he was playing with her and squeezed her stomach and thought that he had hurt her doing that.[28]

////

---

[26]Dkt. no. 37-2, Ex. 18a, at 95-96.

[27]*Id.*, at 96-97.

[28]Dkt. no. 37-1, Ex. 18, at 61-62.

10

1    Dr. Robert Bucklin, M.D., performed the autopsy on Chelsey Hachez' body on

2  April 7, 1996.  He testified as an expert in forensic pathology.  (Dkt. no. 37-2, Ex. 18a, at

3  17-24.)

4    On external examination, Dr. Bucklin did not find any bruising on the scalp, but

5  he did notice on palpation an abnormal increased mobility of the bones.   X-rays

6  reflected a number of skull fractures, which were even more clearly apparent on internal

7  physical examination.  X-rays further reflected separation and widening at the sutures,

8  the naturally occurring lines of separation between the bones of the infant skull.  Dr.

9  Bucklin attributed this widening at the skull suture lines to the effect of intracranial

10  pressure as the infant's brain swelled.  There were no other injuries or defects apparent

11  in examining the remainder of the infant's body, other than pulmonary edema (fluid

12  filling the lungs) secondary to the brain injury.[29]

13    When Dr. Bucklin began his internal examination, he initially encountered "a very

14  massive hemorrhage," or area of bleeding, at the back of the head.  He then found three

15  different skull fractures.  The first was a five-inch long fracture on the left side of the

16  skull where the fractured bone was widely separated by an eighth of an inch.  The

17  second was a non-separated fracture on the right side above the ear.  The third was in

18  the occipital, or back, portion of the skull, consisting of an irregular rectangular shaped

19  fracture. The fractures appeared to have originated during "the same rough time frame,"

20  and there were no older healing fractures or injuries.[30]

21    Dr. Bucklin observed bilateral retinal hemorrhaging as well as hemorrhaging

22  between superficial membranes — the dura mater and arachnoid — enveloping the brain

23  but no major hemorrhaging inside the substance of the brain tissue itself.[31]  He testified

24  _____

    [29]Dkt. no. 37-2, Ex. 18a, at 25-29 & 51.

25    [30]*Id.*, at 30-34.

26    [31]The brain and spinal cord are enveloped by three membranes, or meninges,
    that are referred to in superficial-to-deep order as the dura mater, arachnoid, and pia

27  mater.  Dr. Bucklin thus observed bleeding into the areas between the first and second
    and second and third such enveloping membranes.  *See* dkt. no. 37-2, Ex. 18a, at 35 &

28  44.

1   that the subdural and subarachnoid hemorrhaging that he observed was indicative of

2   blunt force injury.  He further testified that the retinal hemorrhaging was indicative of

3   intracranial pressure. (Dkt. no. 37-2, at 34-36.)  According to Dr. Bucklin's testimony, it

4   would take "a lot of force" to produce the three fractures observed.  The three different

5   locations reflected three different impacts. The separated fracture on the left side in

6   particular resulted from "direct force injury to the bone itself" from "a very forceful blow."

7   He testified that he "would not expect to find a fracture that wide from other than a

8   rather powerful force."  The depression of the skull bone into the brain space on another

9   one of the fractures also indicated that "extensive" force was used.[32]

10      Dr. Bucklin gave the following opinion testimony as to the manner in which

11   Chelsey Hachez could have been subjected to such "rather powerful" and "extensive"

12   trauma:

13      Q:   Are any of these three fractures consistent with a fall
            from a bed onto the floor?
14

15      A:   No.

16      Q:   Even if it were a relatively high bed?

17      A:   No, it would take a whole lot more force.  A baby
            falling two or three feet would not gain enough
18           momentum to produce this kind of an injury.

19      Q:   Now, the fall from a bed wouldn't even produce one of
            these fractures, would it?

20      A:   Not in my opinion.

21                              . . .

22      Q:   Did these [three] fractures show that there were three
            separate points of impact?
23

24      A:   Yes.

25      Q:   So however high the fall or the blow would need to
            [be to] cause this, there would need to be three
26           separate blows or falls to cause the fractures?

27      A:   That's right.

28   [32]Dkt. no. 37-2, Ex. 18a, at 30 & 36-38.

. . .

Q:      . . . . Even if the child fell from a height and sustained
        a fracture and bounced, would the second fall be
        sufficient to cause one of those fractures?

A:      No, because the momentum of a bounce would be
        very little, nowhere near enough to injure the bone.

. . .

Q:      And, in your opinion, what is [the] cause of death?

A:      In my opinion, Chelsey Hachez['] death came as a
        result of skull fractures and intracranial hemorrhage
        due to blunt force trauma.

Q:      Did you form an opinion as to the cause of death or
        manner of death?

A:      Yes, I ruled it a homicide.

Dkt. no. 37-2, Ex. 18a, at 39-41; see also id., at 46.

Dr. Bucklin acknowledged that the three skull fractures that he observed also

could result from a traumatic accident, such as in a car accident where a car rolled over

several times and the infant's head was hit in three different places.  However, he would

expect in that instance to also observe injuries to other parts of the infant's body as well,

and Chelsey Hachez was struck three times exclusively in the head.[33]

Dr. Bucklin testified that an infant subjected to the three skull fractures would lose

consciousness, as opposed to cessation of vital signs, "in terms of minutes, a very few

_____

[33]Dkt. no. 37-2, at 46-47 & 51.  Moreover, there was no evidence at trial that
Chelsey Hachez was involved in such a major car accident, whether on the drive down
to Las Vegas on the morning of April 6, 1997, or otherwise.  There was no evidence that
she was in a vehicle – such as Graham's vehicle on the ride down – that sustained the
major damage that would be sustained in such a multiple rollover scenario. There
similarly was no evidence that any adult who was with her – such as Graham on the
ride down – also sustained any injuries corresponding to such a major vehicular
accident. Moreover, as discussed in the text, infra, there would be only a relatively small
interval of time following the three skull fractures before the baby lost consciousness.  A
scenario under which she was involved in a never-reported major vehicular accident
inflicting three skull fractures (but no other injuries) but did not lose consciousness until
after Graham drove her from Pahrump to Las Vegas would be implausible to the
extreme.  Nor did the evidence reflect that Graham stated at any time to anyone that the
baby was subjected to physical force from a car accident, as opposed to from a fall from
a bed or from his own hand.

13

minutes, perhaps less" stating further that "there is no way to tell you precisely how many seconds or minutes the child was fully conscious." (Dkt. no. 37-2, Ex. 18a, at 41-42 & 47-48.)

Dr. Thomas Sherwin, M.D., treated Chelsey Hachez for an ear infection on March 25, 1996, less than two weeks before April 6, 1996. Dr. Sherwin further was accepted as an expert in the fields of pediatric medicine and emergency pediatric medicine. He had published two professional articles on pediatric medicine, including a published article on the recognition of child abuse in the emergency room. Following upon his particular work in the field, he looked for indicia of child abuse every time that he treated a pediatric patient, "every time," in "[e]very case." If he observed signs of such abuse, including specifically in the interaction between the care giver and the child, he reflected that observation in his treatment notes.[34]

When Dr. Sherwin observed the interaction between Kimberly Hachez and Chelsey Hachez on March 25, 1996, he did not see anything in their interaction that was indicative of child abuse. He observed a normal healthy baby, other than the ear infection, with no evidence of child abuse, and who was active, alert, and smiling.[35]

Kimberly Hachez' parents, Judy and Robert Holzhauser, also were called by the State.

According to Judy Holzhauser, she spoke with Leslie Graham by telephone on April 6, 1996. Her phone records reflected that the call occurred at 11:56 a.m. Pacific time, which would have been after the paramedics and police already had been called to the couple's apartment in Las Vegas. According to Judy Holzhauser, Graham told her at that time that Chelsey was fine and was laying on the bed drinking her bottle. Thereafter, after she learned of the baby's passing, Graham told her in another telephone conversation that the baby had fallen off the bed and hit her head.[36]

---

[34]Dkt. no. 37-3, Ex. 18b, at 7-12.

[35]*Id.*, at 11-13.

[36]Dkt. no. 37-1, Ex. 18, at 76-82.

14

According to Robert Holzhauser, he traveled to Las Vegas and then personally spoke to Graham a week after the baby's death.  Graham gave him three different versions of what allegedly happened.  In the first version, the baby was laying on the bed, rolled over to get her bottle, and fell off the bed, with Graham not stating where he was at the time.  In the second version, Graham heard a noise from a bedroom and then went to the room where the baby was and saw her unconscious on the floor.  In the third version, Graham was in the kitchen, the baby rolled off the bed and started crying, and he went and picked her up.[37]

In all of the varying, shifting accounts attributed to Leslie Graham at trial – whether to the paramedics, the police, Kimberly Hachez, or her parents – Graham never told anyone that the baby was subjected to any impact or other physical force other than from an alleged fall from the bed and/or from Graham himself.  He spoke only of the alleged fall and of his variously allegedly hitting or punching the baby's stomach, giving her a chest thrust, holding her in a bear hug, giving her CPR and/or squeezing her stomach.  In those accounts, he spoke of no other physical force being applied to Chesley Hachez, at any other time that morning, other than from the baby's alleged fall from the bed and/or by Graham himself.

The defense presented two witnesses seeking to establish that Graham was good with children.

Patricia Taber was Graham's ex-wife.  She was pregnant with a daughter by another father when she became involved with Graham.  He adopted the daughter as his own, and they also had another daughter together. The second daughter was developmentally challenged.  Taber testified that Graham was "great" with the children and that she had never seen Graham hit or abuse the children, including when they were screaming and crying.[38]

---

[37]Dkt. no. 37-2, Ex. 18a, at 118-21.

[38]Dkt. no. 37-3, Ex. 18b, at 57-61.

1    Tracey Hutchins was involved with Graham over a four year period, and they had

2    a son together.  Hutchins testified that Graham was "very caring" with children and that

3    she had never seen Graham hit or abuse their son, including when he was screaming

4    and crying.[39]

5    Neither witness spoke directly to differences, if any, in Graham's behavior when

6    he was drinking.

7    At the conclusion of the case, the State's proposed jury instructions provided for

8    possible verdicts only of either first-degree murder as a result of child abuse or acquittal.

9    The State's proposed instructions did not include a theory of first-degree murder based

10   upon a homicide allegedly having been willful, deliberate and premeditated under

11   N.R.S. 200.030(1)(a).  The State's instructions instead relied exclusively on a felony-

12   murder theory under N.R.S. 200.030(1)(b) based upon a homicide allegedly having

13   been "[c]ommitted in the perpetration or attempted perpetration of . . . child abuse."  The

14   statute defined "child abuse" as "physical injury of a nonaccidental nature to a child

15   under the age of 18 years."  N.R.S. 200.030(6)(b).[40]

16   The State's proposed instructions did not set forth any allegedly lesser included

17   offenses.  The State maintained that the only possible verdicts based on the evidence

18   were first-degree murder by child abuse due to non-accidental injury or an acquittal.

19   The defense requested instructions for lesser included offenses of second-degree

20   murder and involuntary manslaughter. The state district court gave the involuntary

21   manslaughter instruction based on the premise that leaving the baby unattended on the

22   bed could be construed as acting in an unlawful manner for involuntary manslaughter if

23   the death resulted accidentally from the baby falling off the bed.  The court declined to

24   give a second-degree murder instruction, accepting the State's premise that a homicide

25   ///

26

27   [39]Id., at 66-67.

28   [40]Dkt. no. 17-3, Ex. 18b, at 69-73.

instead through non-accidental means allowed only for a verdict of first-degree felony murder by child abuse.[41]

In part pertinent to this case, the jury thus was instructed as follows with regard to the murder charge:

INSTRUCTION NO. 5

Murder is the unlawful killing of a human being, with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned.

INSTRUCTION NO. 6

Malice aforethought, as used in the definition of Murder, means the intentional doing of a wrongful act without legal cause or excuse or what the law considers adequate provocation. The condition of mind described as malice aforethought may arise, not only from anger, hatred, revenge or from particular ill will, spite, or grudge toward the person killed, but also may result from any unjustifiable or unlawful motive or purpose to injure another.

INSTRUCTION NO. 7

Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

INSTRUCTION NO. 8

Malice as applied to murder does not necessarily import ill will toward the victim, but signifies general recklessness of others' lives and safety or disregard of social duty.

INSTRUCTION NO. 9

"Child abuse" means physical injury of a nonaccidental nature to a child under the age of 18 years.

INSTRUCTION NO. 10

Murder that is the result of child abuse is Murder in the First Degree.

Dkt. no. 37-7, Ex. 19.

///

_____

[41] Id., at 70-87.

17

The court instructed that the jury possibly could return a verdict of involuntary manslaughter if the jury ruled out first-degree murder.  The court instructed, *inter alia*:

INSTRUCTION NO. 13

Involuntary Manslaughter is the killing of a human being, without any intent to do so, in the commission of an unlawful act or a lawful act which probably might produce such a consequence in an unlawful manner; but where the involuntary killing occurs in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of felonious intent, the offense is Murder.

Dkt. no. 37-7, Ex. 19.

C.      **Relevant Direct Appeal Holdings**

On direct appeal from the conviction, Graham argued that the state district court improperly had rejected the defense request to include a lesser included offense charge also for second-degree murder.

The Supreme Court of Nevada rejected Graham's argument in a published opinion extensively discussing the issue.  *See Graham v. State*, 116 Nev. 23, 992 P.2d 255 (2000).  The court held, *inter alia*, that: (1) a murder done in an enumerated manner under N.R.S. 200.030(1)(b), such as in the perpetration of child abuse, constitutes first-degree murder as a matter of law if it was done in the enumerated manner as shown by the facts of the particular case; (2) an alleged absence of deliberation or premeditation is immaterial to a charge of first-degree murder by child abuse and thus cannot reduce the offense to second-degree murder; (3) it thus is unnecessary to instruct juries on second-degree murder "when proofs in the case can only support a theory of guilt" done in the enumerated manner; and (4) Graham's argument for a second-degree murder instruction "was inconsistent with any of the evidence in this case because the only cause of death proved below was the administration of the three separate skull fractures, which could not have resulted from an accidental fall from the bed."  992 P.2d at 258.  The court further concluded that the involuntary manslaughter instruction should not have been given because, *inter alia*, "[l]eaving a child alone on an ordinary bed under the circumstances described is not an 'unlawful' act of either neglect or

18

1    endangerment."  992 P.2d at 259. The court acknowledged that it would have been

2    error to not give second-degree murder and involuntary manslaughter instructions had

3    there been evidence consistent with a theory of neglect or endangerment.  However,

4    the court concluded that "the proofs before this jury were only consistent with a finding

5    of either guilty of child-abuse murder or not guilty."  *Id.*

6              **D.      Relevant State Post-Conviction Submissions and Proceedings**

7              On state post-conviction review, Graham alleged, *inter alia*, that he was denied

8    effective assistance of trial counsel because counsel did not present expert testimony

9    supporting a theory of defense of child neglect or endangerment in support of a lesser

10   included second-degree murder charge. Graham was represented by appointed

11   counsel in the state post-conviction proceedings.

12             Graham, through counsel, sought an extension of time to obtain and present

13   medical evidence establishing what defense counsel could have and should have

14   presented at trial that would have supported a second-degree murder charge.

15   Ultimately, on January 16, 2002, the state district court granted petitioner's request to

16   take the post-conviction case off the calendar so that he could develop and present

17   such evidence.[42]

18             Over five years later, on June 26, 2007, Graham moved to reset the matter and

19   moved also for authorization of funds to retain an expert witness.  The motion referred

20   to allegedly related expert testimony reflected in a Nevada case published in 2000,

21   three years after Graham's 1997 trial.  Petitioner further attached approximately sixty

22   pages of medical treatises and other materials in support of the request for funds for an

23   expert witness. The materials were presented to establish that expert medical testimony

24   potentially could call the cause of the baby's death advanced by the State at trial into

25   question.[43]

26

27        [42]Dkt. no. 42, Exhs. 24-26.

28        [43]Dkt. nos. 22-13 & 22-14, Ex. 12 (two parts).

1    Review of the supporting materials tendered reflects the following.

2    *First*, while the materials were presented in support of a request for expert

3    witness funding, it nonetheless remains noteworthy at the outset that none of the

4    materials constituted expert opinion testimony applying the generalities discussed to the

5    facts of Graham's case.   Petitioner's initial showing consisted only of the treatises and

6    other materials coupled with counsel's argument.   Such materials of course did not

7    constitute a substitute for expert opinion testimony applied to the particular case.   The

8    documents instead merely constituted an assemblage of treatises and other materials

9    that in and of themselves would have not been admissible as competent evidence

10   outside of expert testimony.

11   *Second*, it is subject to substantial question whether all of the material constituted

12   peer-reviewed material and/or material that otherwise properly would be relied upon by

13   an expert witness.   A writing by a physician does not automatically qualify.   The source

14   and date of some of the material is not even clear.[44]

15   *Third*, none of the materials appear to have been published or available at the

16   time of Graham's trial; and none of the expert testimony from the allegedly similar case

17   referred to by counsel had been presented prior to Graham's June 1997 trial.   Even the

18   literature that was neither dated nor sourced clearly was generated subsequent to

19   Graham's trial, given that the material cited other material published after the date of the

20   trial.[45]

21   *Fourth*, literature discussing whether subdural hemorrhaging and retinal

22   hemorrhaging could occur without child abuse, whether such findings thus could

23   produce a misdiagnosis of child abuse by "shaken baby syndrome," and/or whether

24   ///

25

26   [44]Dkt. no. 22-14, Ex. 12, Exhs. 3, 4 & 6 thereto (at electronic pages 7-20 & 25-45).

27   [45]As discussed further, *infra*, trial counsel's performance necessarily is assessed

28   based upon counsel's perspective *at the time of trial.*

such findings instead could occur from a vaccine or vaccine preservative completely begged the question in Graham's case.

The medical expert findings of child abuse in Graham's case were not premised merely upon a finding of subdural hemorrhage and retinal hemorrhage.  The medical expert findings of child abuse in his case instead were based upon the presence of three skull fractures.  None of the materials presented suggested that an infant could sustain three skull fractures without child abuse or a catastrophic accident not reflected by the evidence in Graham's case.  None of the materials suggested that the presence of three skull fractures could lead to a misdiagnosis of "shaken baby syndrome."  Indeed, no diagnosis of "shaken baby syndrome" ever had been made in Graham's case; and the medical experts instead testified that the three skull fractures resulted from blunt force trauma directly to the baby's head.  None of the materials suggested that an adverse reaction to a vaccine or vaccine preservative could produce three skull fractures in an infant.[46]  Graham's case, involving three skull fractures, had nothing to do with either "shaken baby syndrome" or an adverse product reaction.

*Fifth*, the materials regarding injuries from falls contained neither case studies nor discussion reflecting that a baby could sustain three skull fractures from a horizontal fall from 19 inches onto a carpeted and padded floor.  General discussion suggesting that a child or infant possibly could sustain subdural hemorrhaging and/or retinal hemorrhaging from a playground fall  from as little as two feet did not suggest that a baby could sustain three skull fractures from a horizontal fall of 19 inches onto a carpeted and padded floor.[47]

///

---

[46] *See* dkt. no. 22-14, Ex. 12, Exhs. 2-6 thereto.

[47] *See* dkt. no. 22-13, Ex. 12, Ex. 1 thereto. Moreover, case studies that measured the distance involved from the height of a child's feet when standing on, *e.g.*, playground equipment, necessarily understated the distance that the head would travel in such a fall. Here, the baby – at least according to some of Graham's varying accounts – would have fallen from a horizontal position off a bed that was only 19 inches high.

21

*Sixth*, the materials regarding injuries from falls similarly contained neither case studies nor discussion reflecting that a baby plausibly would remain alert and active for an hour or more after sustaining three skull fractures from blunt force trauma. The materials included case studies where a child would remain substantially asymptomatic and active for a significant period of time after an initial fall and injury before succumbing.  None of the cases, however, involved an infant with three skull fractures.[48]

*Seventh*, discussion of autopsy protocols and preserving blood from subdural hemorrhaging for lab analysis also largely begged the question. Nothing in the materials or in post-conviction counsel's lay presentation identified any alleged protocol failure by Dr. Bucklin that would produce a false autopsy finding of three skull fractures.  Nothing in the materials reflected that further analysis of blood from subdural hemorrhaging could override the immediately apparent finding that the baby died, in a span of minutes not days, from the blunt force trauma necessary to inflict three skull fractures.[49]  The case, again, was not a "shaken baby syndrome case" where only internal hemorrhaging was present and potentially might lead an expert to reach different conclusions if blood samples were analyzed further.

The state district court granted petitioner's request for funds for an expert witness, based upon the representation that such funds had not been available earlier, either when the case was tried or on post-conviction review. The court thereafter allowed petitioner a total of another five months to develop expert witness testimony supporting his claims.[50]

On January 24, 2008, petitioner did not tender an executed expert report. Petitioner instead tendered an unsigned declaration represented to be a typed version

///

---

[48]*Id.*

[49]See dkt. No. 22-14, Ex. 6; see also dkt. no. 22-13, at 15-18 (memorandum).

[50]Dkt. no. 42, Exhs. 27-31.

of a handwritten declaration given to counsel by Dr. Todd Cameron Grey, M.D., as an alleged expert forensic pathologist.[51]

In pertinent part, the typewritten material stated, *inter alia*:

Having reviewed the above documents [see note *infra*] and that were provided to me, I believe that the child's death is consistent with child abuse. I believe that a non medically trained person who did not handle the child or place the child would not necessarily have been able to distinguish between sleep and the consequences of the child's head injury. However, a reasonable care giver would have noticed the child was experiencing medical difficulties and not just sleeping and would have sought immediate health care.

Dkt. no. 42, Ex. 32, at 2.[52]

It does not appear that petitioner ever tendered to the state district court thereafter a declaration actually executed by a witness.

The state district court denied relief without an evidentiary hearing.  The court noted that "[a]fter a five year delay, all that has been provided to the court is defense counsel's own version of an equivocal statement made by the doctor."  The court found in pertinent part that "[t]he hearsay declaration offered by Dr. Grey does not establish a reasonable probability of a more favorable result had trial counsel obtained similar medical testimony at the time of trial."[53]

///

///

---

[51]Dkt. no. 42, Ex. 32.  The state court filing referred to an attached curriculum vitae, but it does not appear that one was attached with the filing in the state court.  The Court's order directed that respondents file a copy of the declaration and all documents attached therewith.  *See* dkt. no. 41, at 2.

[52]The typewritten material reflected that the expert had reviewed the autopsy report, the coroner's investigation report, a "transcript excerpt of the testimony of Dr. Bucklin," a paramedic report, an unidentified statement by Graham, and the state supreme court's opinion [which provided only a brief three-paragraph outline of the facts].  The typewritten material did not reflect that the expert had reviewed the testimony of the trauma room pediatric critical care specialist, Dr. Sterett.  Nor did the material reflect that the expert had reviewed any of the trial testimony reflecting the circumstances on the morning of the baby's death and further reflecting Graham's multiple varying accounts of the incident.

[53]Dkt. no. 22-15, Ex. 13, at 3.

1    The state supreme court affirmed on the post-conviction appeal.   The Court

2  discusses the state supreme court's reasons, *infra*, in the discussion of petitioner's

3  federal claims.

4  **II.    GOVERNING LAW**

5    The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

6  deferential" standard for evaluating state-court rulings that is "difficult to meet" and

7  "which demands that state-court decisions be given the benefit of the doubt."   *Cullen v.*

8  *Pinholster*, 131 S.Ct. 1388, 1398 (2011). Under this highly deferential standard of

9  review, a federal court may not grant habeas relief merely because it might conclude

10  that the state court decision was incorrect.  131 S.Ct. at 1411.  Instead, under 28 U.S.C.

11  § 2254(d), the court may grant relief only if the state court decision: (1) was either

12  contrary to or involved an unreasonable application of clearly established law as

13  determined by the United States Supreme Court; or (2) was based on an unreasonable

14  determination of the facts in light of the evidence presented at the state court

15  proceeding.  131 S.Ct. at 1398-1401.

16    A state court decision is "contrary to" law clearly established by the Supreme

17  Court only if it applies a rule that contradicts the governing law set forth in Supreme

18  Court case law or if the decision confronts a set of facts that are materially

19  indistinguishable from a Supreme Court decision and nevertheless arrives at a different

20  result.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003).  A state court decision is

21  not contrary to established federal law merely because it does not cite the Supreme

22  Court's opinions.  *Id.*  Indeed, the Supreme Court has held that a state court need not

23  even be aware of its precedents, so long as neither the reasoning nor the result of its

24  decision contradicts them.  *Id.*  Moreover, "[a] federal court may not overrule a state

25  court for simply holding a view different from its own, when the precedent from [the

26  Supreme] Court is, at best, ambiguous,"  540 U.S. at 16, because a decision that does

27  not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to

28  clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9ᵗʰ Cir. 2004).

To the extent that the state courts' factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9ᵗʰ Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9ᵗʰ Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a

25

1   reasonable probability that, but for counsel's unprofessional errors, the result of the

2   proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799,

3   807-08 (9th Cir. 2003).

4       While surmounting *Strickland*'s high bar is "never an easy task," federal habeas

5   review is "doubly deferential" in a case governed by AEDPA. In such cases, the

6   reviewing court must take a "highly deferential" look at counsel's performance through

7   the also "highly deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

8       The petitioner bears the burden of proving by a preponderance of the evidence

9   that he is entitled to habeas relief.  *Pinholster*, 131 S.Ct. at 1398.

10  **III.    DISCUSSION**

11      **A.    Grounds 1 and 2**

12      In Grounds 1 and 2, petitioner alleges in principal part that he was denied

13  effective assistance of counsel in violation of the Sixth and Fourteenth Amendments

14  because trial counsel did not present expert medical testimony providing a factual basis

15  for a lesser included offense instruction for second-degree murder and/or second-

16  degree murder by child neglect. Petitioner alleges that he would not have been

17  convicted of first-degree murder if the jury had been so instructed.[54]

18

_____

19      [54]The Court has been unable to discern a distinction with a substantial difference
    between Grounds 1 and 2 in the petition, and it therefore discusses the grounds
20  together.
        To the extent, if any, that petitioner seeks relief separately for an exhausted legal
21  claim alleging a "due process" violation based on alleged ineffective assistance of
    counsel, the Due Process Clause of the Fourteenth Amendment provides no greater
22  protection in the context presented than does the Sixth Amendment.
        Petitioner additionally refers to the failure of defense counsel to present expert
23  medical testimony at the preliminary hearing.  Assuming, *arguendo*, that such a claim is
    exhausted, there is not a reasonable probability that, but for a failure to present defense
24  medical testimony at the preliminary hearing the outcome of the proceeding would have
    been different. Given the slight burden on the State at such a Nevada proceeding, there
25  is not a reasonable probability of petitioner not being bound over to the district court on
    the first-degree murder charge. Thereafter, what was presented at the preliminary
26  hearing would have had no bearing on the jury's consideration of the case at trial.
    While lay habeas petitioners often believe that the defense can win the case at the
27  preliminary hearing by presenting opposing evidence, that belief generally is not well-
    founded given the State's slight burden of proof at a preliminary hearing under the
28  governing Nevada state law.  Presenting defense evidence at a preliminary hearing thus
    *(fn. cont…)*

The Supreme Court of Nevada rejected the claims presented to that court on state post-conviction review on the following grounds:

> Appellant argues that the district court erred in denying his claim that trial counsel was ineffective for failing to present expert medical testimony in support of his theory of second-degree murder.  Appellant claims that he was prejudiced by trial counsel's performance because the district court denied appellant's request for jury instructions on second-degree murder because there was no evidentiary support. By definition, a murder occurring during the perpetration of child abuse is first-degree murder. 1995 Nev. Stat., ch. 168, § 1, at 257 and ch. 443, § 44, at 1181-82. Appellant argues that second-degree felony murder is a lesser included offense to first-degree murder if it is shown that the death occurred as a result of neglect. *See Sheriff v. Morris*, 99 Nev. 109, 118-19, 659 P.2d 852, 859 (1983) (concluding that a defendant can be charged with second-degree felony murder if the victim died during an inherently dangerous felony committed by the defendant that is not one of the enumerated felonies constituting first-degree felony murder).  Appellant argues that the failure of trial counsel to present expert evidence that the child's death was caused by neglect rather than abuse constituted ineffective assistance of counsel.
>
> Based on our review of the record on appeal, we conclude that appellant failed to demonstrate that he was prejudiced by trial counsel's performance.  We concluded on direct appeal that the evidence presented at trial was only consistent with a finding of either guilty of child-abuse murder or not guilty. *Graham*, 116 Nev. at 31, 922 P.2d at 259.  In his petition, to support his theory of second-degree murder, appellant provided the unsworn, unsigned affidavit of Dr. Todd Grey which stated that the injuries suffered by the child were consistent with child abuse, but that if the person who was watching the child was not the one who caused the injuries, then that person was only unreasonable in not seeking help for the child.
>
> The district court found this unsigned, unsworn declaration by Dr. Grey equivocal and unpersuasive.  We agree.  Even if this unsworn, unsigned affidavit was sufficient to show appellant was neglectful in not seeking medical treatment, appellant has not alleged that someone else committed the child abuse.  His theory at trial was that the child received her injuries from falling from a bed.  Testimony at trial and the affidavit provided in appellant's petition, support the conclusion that the injuries to the child were caused by child abuse.  Therefore, appellant failed to provide sufficient evidence that had trial counsel presented Dr. Grey's statement that there was a reasonable probability that the district court would have allowed instructions on second-degree murder or that the jury would have

---

(…fn. cont.)
typically (a) does not benefit the defense and (b) provides the State gratuitous discovery of the defense's case.

To the extent that any of the claims discussed in this footnote are unexhausted, the Court finds them to be without any colorable merit and accordingly dismisses the claims under § 2254(b)(2), in the alternative to a dismissal on deferential review under AEDPA.

1  found appellant guilty of second-degree murder rather than first-degree murder. Therefore, the district court did not err in denying this claim.

2  Dkt. no. 22-18, Ex. 16, at 2-3.

3  The state supreme court's holding that petitioner failed to carry his burden of

4  demonstrating prejudice was neither contrary to nor an unreasonable application of

5  *Strickland* or other controlling Supreme Court precedent.

6  The purported expert declaration presented on state post-conviction review did

7  not in any sense contradict the abundant medical evidence presented at trial

8  establishing that Chelsey Hachez died from blunt force trauma causing three skull

9  fractures that resulted from child abuse.  The purported declaration instead confirmed

10  that her death was "consistent with child abuse," while presenting no contrary expert

11  opinion whatsoever that her three skull fractures could have resulted from a cause other

12  than child abuse on the facts presented.[55]

13  Graham contends that defense expert medical testimony is essential in cases of

14  alleged shaken baby syndrome.  However, there was no diagnosis ever made in this

15  case of shaken baby syndrome. The literature presented by petitioner in the state courts

16  did not remotely suggest that a case of alleged shaken baby syndrome could produce

17  three skull fractures in an infant, including a fracture with a separation between the

18  shattered bone of an eighth of an inch. The purported expert declaration made

19  absolutely no assertion that the objective physical findings in the case – three skull

20  fractures – would be present where an allegedly mistaken diagnosis of shaken baby

21  syndrome had been made.  Shaken baby syndrome has nothing to do with this case.

22  Nor did either the purported expert declaration or the previously tendered

23  literature opine that an infant could sustain three skull fractures from a nineteen inch fall

24  from a supine position onto a carpeted floor with padding.  The purported declaration

25  instead stated that Chelsey Hachez's death was – as all of the expert medical witnesses

26  also had testified at the trial – "consistent with child abuse."  Petitioner thus presented

27

28  [55]For factual background to the analysis herein, see text, *supra*, at 7-14 & 19-22.

28

no expert medical evidence on state post-conviction review tending to establish that trial counsel would have been able to present expert testimony at trial supporting a theory that the baby sustained three skull fractures from a fall from the bed.[56]

Given the thus still-uncontradicted expert medical evidence that Chelsey Hachez's death was consistent with child abuse, after she sustained three skull fractures from blunt force trauma, the remainder of the purported expert declaration begged the question. Any attempted supposition that Graham possibly at worst failed to appropriately recognize and react to child abuse committed by another ignores the fact that neither the trial evidence nor even Graham's own shifting accounts tended to establish that another person fractured Chelsey Hachez's skull three times. In Graham's own shifting accounts, the only force applied to the baby came from the alleged fall – which could not cause such injury under the still-uncontradicted medical evidence – or by his own hand." The equivocal purported declaration did not include any expert opinion tending to establish that the baby could have sustained three skull fractures earlier while in Pahrump and remained alert, conscious, and asymptomatic during the hour plus drive to Las Vegas and thereafter in the apartment before succumbing at 10:20 a.m. Nothing in the trial evidence, the literature tendered on state post-conviction review, or the equivocal declaration suggests that an infant could sustain such grievous trauma and not succumb during that long interval. The supposition that a care giver possibly might have failed to recognize and react to child abuse by another simply begged the question. There was no possible instrumentality of

---

[56]Moreover, the state supreme court decision on direct appeal referred to in the purported expert declaration ruled out the possibility that leaving the baby on the bed could constitute even child neglect. *See Graham*, 992 P.2d at 259. If leaving the baby on the bed could not constitute unlawful child neglect or endangerment, then it follows with even greater force that leaving the baby on the bed could not constitute child abuse. Thus, the equivocal declaration would not be referring to an alleged fall from a bed as "child abuse." Nor does anything stated in the purported declaration reflect that the expert would be equating an alleged fall from a bed (while in Graham's care) with child abuse. Nor, as discussed in the text, does the purported declaration contain any expert opinion reflecting that such an alleged fall would cause three skull fractures.

1  child abuse consistent with the trial evidence, including in Graham's own shifting

2  statements, other than by his own hand.[57]

3          The state supreme court's holding that Graham failed to demonstrate prejudice

4  under *Strickland* thus was neither contrary to nor an unreasonable application of clearly

5  established federal law.  The purported expert evidence tendered on state post-

6  conviction review did not establish a plausible factual basis for a defense based upon a

7  lesser included offense of second-degree murder by child neglect under Nevada state

8  law.  The state post-conviction tender did not contradict the trial medical evidence that

9  Chelsey Hachez died from child abuse, and there was no mechanism for such child

10 abuse reflected by the trial evidence other than Graham's own hand.   A bare

11 supposition that Graham instead merely failed to properly recognize and react to child

12 abuse inflicted by another is not supported by competent and probative evidence

13 tendered either at trial or on post-conviction review.

14          Grounds 1 and 2 therefore do not present a basis for federal habeas relief.

15 **B.      Ground 3**

16          In Ground 3, petitioner alleges in principal part that he was denied effective

17 assistance of counsel, once again, because trial counsel failed to present evidence that

18 would have allowed for the submission of instructions and a verdict form for second-

19 degree murder.  Petitioner alleges on this claim that he therefore was subjected to a

20 ──────────────

21       [57]The purported declaration does not reflect that Dr. Grey reviewed any
   testimony other than an excerpt of the testimony of the forensic pathologist who
22 performed the autopsy.  The state supreme court decision that the expert reviewed
   contained only a very brief three-paragraph broad overview of the evidence.  *See* 992
23 P.2d at 256.  Without review of the trial evidence itself – or a more detailed recital of the
   evidence such as in this order – the expert would not have been presented with the
24 evidence that Graham left Pahrump with the baby more than an hour before the 911
   call.  The purported declaration does not present any expert opinion tending to establish
25 that the baby could have sustained three skull fractures in Pahrump but still been alive,
   alert, and allegedly reaching for a bottle over an hour later in Las Vegas, to lose
26 consciousness and succumb only thereafter. The purported declaration speaks only
   equivocally and generally without addressing how its conclusion that the baby's death
27 was consistent with child abuse necessarily fit in with the time line reflected by the
   evidence in the case.  Defense expert evidence corroborating State evidence that the
28 baby died from child abuse could not have established second-degree murder by child
   neglect on the remaining evidence.

mandatory presumption of malice and guilt of first-degree murder. He contends that if counsel had presented the evidence, he would have been found guilty of second-degree murder or at the very least would not have been subject to such an alleged mandatory presumption.[58]

The state supreme court rejected the claim presented to that court on the following grounds:

> Appellant . . . argues that the district court erred in denying his claim that trial counsel was ineffective for failing to secure a second-degree murder instruction. He argues that this failure to have a second-degree murder instruction given at his trial created a "mandatory presumption" that appellant was guilty of first-degree murder. Appellant appears to argue that the first-degree murder instructions directed the jury to find a presumed fact against the accused, however, appellant failed to explain what this presumed fact is. Regardless, appellant's claim lacks merit. Trial counsel requested instructions on second-degree murder. The district court refused that request, and this court upheld that decision on direct appeal. We explained that murder by child abuse is first-degree murder as a matter of law under NRS 200.030(1) and therefore, "such murders do not fall within the category of murder that can be reduced in degree by failure to prove deliberation and premeditation. Nor can such a murder be reduced in degree because it is committed without intent to kill and would otherwise fall within the ambit of [second-degree felony murder]: if done with malice and in an enumerated manner, the killing constitutes first-degree murder by legislative fiat." *Graham*, 116 Nev. at 28-29, 992 P.2d at 258. Therefore, because the only evidence adduced at trial demonstrated that the child's death was caused by child abuse, we held that appellant was not entitled to second-degree murder instructions. Moreover, it appears that the district court instructed the jury on involuntary manslaughter. While we concluded on direct appeal that it was error for the district court to give the involuntary manslaughter instruction, *id.* at 31, 992 P.2d at 260, the giving of the instruction belies appellant's claim that the jury was only given first-degree murder instructions. Under
>
> the circumstances and considering our decision on direct appeal, appellant's trial counsel was not deficient nor was appellant prejudiced by trial counsel's failure to secure second-degree murder instructions in the instant case, and therefore, the district court did not err in denying this claim.

Dkt. no. 22-18, Ex. 16, at 3-4.

---

[58]As with Grounds 1 and 2, to the extent, if any, that Graham seeks relief separately for an exhausted legal claim alleging a "due process" violation based on alleged ineffective assistance of counsel, the Due Process Clause of the Fourteenth Amendment provides no greater protection in the context presented than does the Sixth Amendment.

1    The state supreme court's holding that petitioner had failed to demonstrate either

2   deficient   performance   or   resulting   prejudice   was   neither   contrary   to   nor   an

3   unreasonable application of *Strickland* or other controlling Supreme Court precedent.

4    To the extent that the claim in federal and state court has been premised upon

5   the failure of trial counsel to present an evidentiary basis for a second-degree murder

6   instruction, the discussion of Grounds 1 and 2 *supra* applies fully here as well.  The

7   purported expert evidence finally presented on state post-conviction review ─ after an

8   opportunity to develop evidence spanning more than five years ─ corroborated rather

9   than contradicted the medical evidence at trial establishing that the baby died from child

10  abuse.  Under the time line reflected by the remaining trial evidence, which the post-

11  conviction expert apparently did not review, there was no plausible mechanism by which

12  such child abuse was inflicted other than by petitioner.  A supposition that Graham

13  could have been guilty only of child neglect in failing to recognize child abuse committed

14  by another was belied by the trial evidence, which remained uncontradicted on state

15  post-conviction review.  Under the uncontradicted evidence, the baby would have lost

16  consciousness and succumbed within a short interval after being subjected to sufficient

17  blunt force trauma to fracture her skull three times.  She would not have been alert and

18  asymptomatic with such grievous injuries more than an hour later after the drive from

19  Pahrump to Las Vegas.  Petitioner accordingly failed to demonstrate that there was an

20  evidentiary presentation that could have been made by trial counsel that would have

21  supported a lesser included instruction for second-degree murder by child neglect.

22   Moreover, regarding *Strickland*'s performance prong, none of the literature

23  presented by petitioner on state post-conviction review in support of a request for expert

24  testimony was published or available at the time of Graham's trial. In applying

25  *Strickland*, a court must evaluate trial counsel's conduct from counsel's perspective at

26  the time. *See, e.g., Harrington v. Richter*, 131 S.Ct. 770, 789 (2011).  Even if, *arguendo*,

27  the literature tendered in support of state post-conviction relief had a material bearing

28  ///

32

1   on the case, which it did not,[59] none of the tendered literature was available to counsel

2   prior to trial. As the Supreme Court similarly observed in *Richter*, "[r]eliance on 'the

3   harsh light of hindsight' to cast doubt on a trial that took place now more than 15 years

4   ago is precisely what *Strickland*, and AEDPA seek to prevent." *Id.* While the literature in

5   truth did not call the trial medical evidence into material question, reliance on such *post*

6   *hoc* material in any event is precluded under the *Strickland* analysis.

7       The state supreme court's further subsidiary holding that the charges given did

8   not subject petitioner to a mandatory presumption under Nevada state law is the end of

9   that matter. The state supreme court is the final arbiter of Nevada state law. The state

10  supreme court's subsidiary holding further that a second-degree murder charge was not

11  available on the facts presented under state law also is the end of that matter, for the

12  same reason.

13      In sum, petitioner has not established, after an extensive opportunity to present

14  contrary medical evidence on state post-conviction review, that there was a plausible

15  basis in law or in fact for a second-degree murder instruction on the evidence in his

16  case. The state supreme court's rejection of the claim therefore was neither contrary to

17  nor an unreasonable application of *Strickland*.

18      Ground 3 therefore does not provide a basis for federal habeas relief.

19  **IV.   CONSIDERATION OF ISSUANCE OF A CERTIFICATE OF APPEALABILITY**

20      Under Rule 11 of the Rules Governing Section 2254 Cases, the district court

21  must issue or deny a certificate of appealability (COA) if it enters a final order adverse to

22  the petitioner.

23      As to the claims rejected by the district court on the merits, under 28 U.S.C. §

24  2253(c), a petitioner must make a "substantial showing of the denial of a constitutional

25  right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473,

26  483-84 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999). To satisfy this

27

28      [59]See text, *supra*, at 19-21.

33

1  standard, the petitioner "must demonstrate that reasonable jurists would find the district

2  court's assessment of the constitutional claim debatable or wrong."  *Slack*, 529 U.S. at

3  484.

4          Reasonable jurists would not find debatable or wrong the Court's conclusion that

5  the state supreme court's rejection of petitioner's ineffective-assistance claims was

6  neither contrary to nor an unreasonable application of *Strickland*.

7          Petitioner was convicted of first-degree murder based exclusively on a felony-

8  murder theory due to the death having resulted from child abuse, after an eight-month-

9  old infant in his care died after being subjected to sufficient blunt force trauma to inflict

10  three skull fractures.  Petitioner's claims in principal part allege that trial counsel was

11  ineffective for failing to present contrary medical evidence that would have supported a

12  lesser included offense instruction of second-degree murder by child neglect.  The

13  current order details both the trial evidence and the material tendered on state post-

14  conviction review.  The material tendered on state post-conviction review was presented

15  by the petitioner through counsel, after more than five years had been allowed to

16  develop medical evidence, and after funds for an expert were authorized.  See text,

17  *supra*, at 1-23.

18          Under the trial evidence, the only medically plausible cause of the infant's death,

19  after receiving three skull fractures, was through child abuse, as, for example, the infant

20  had not been involved that morning in a major vehicular accident. The remaining

21  evidence in the case, including the varying statements given by petitioner at the time,

22  had no other force being applied to the child other than by petitioner's own hand or an

23  alleged (by petitioner) fall from a low bed onto a carpeted and padded floor. The

24  medical testimony at trial ruled out such a fall causing three skull fractures in the infant.

25  A bare supposition that the infant could have been subjected to such multiple blunt force

26  trauma before being in the petitioner's exclusive care that morning was belied by

27  medical testimony that the infant would not have remained alert and asymptomatic

28  ///

1    during the interval involved, which included an hour plus drive from Pahrump to Las
2    Vegas, Nevada.  See text, *supra*, at 2-15.

3          The unsigned purported expert declaration ultimately tendered on state post-
4    conviction review corroborated rather than contradicted the trial medical testimony
5    establishing that the baby died from child abuse, after receiving three skull fractures
6    from blunt force trauma.  The remaining supposition in the purported declaration that a
7    care giver possibly could have failed to recognize the baby's condition begged the
8    question, given that the only potential instrumentality of child abuse consistent with the
9    trial evidence was by petitioner's own hand.  It does not appear from the recital in the
10   purported declaration of the materials reviewed that the expert reviewed the pertinent
11   trial evidence setting forth the relevant time line, including the time line reflected in
12   petitioner's own statements.  The state supreme court's rejection of petitioner's claims
13   based upon such an equivocal presentation that did not contradict the extensive
14   medical evidence at trial that the baby died from child abuse accordingly was neither
15   contrary to nor an unreasonable application of clearly established federal law.  There is
16   not a reasonable probability that the outcome would have been different if trial counsel
17   had presented evidence along the lines of the equivocal material presented on state
18   post-conviction review.  See text, *supra*, at 18-23 & 25-32.

19         A certificate of appealability therefore will be denied as to all claims presented.

20   **V.     CONCLUSION**

21         IT IS THEREFORE ORDERED that the petition is DISMISSED with prejudice on
22   the merits.

23         IT IS FURTHER ORDERED that a certificate of appealability is DENIED.  See
24   text, *supra*, at 32-34.

25   ///

26   ///

27   ///

28   ///

35

1    The Clerk shall enter final judgment accordingly, in favor of respondents and

2    against petitioner, dismissing this action with prejudice.

3    DATED THIS 22nd day of July 2013.

 

 

 

 

 

                                   MIRANDA M. DU
                                   UNITED STATES DISTRICT JUDGE